Thank you, Your Honor. This is a rare, if not unique, case where the challenge election system in a Section 2 case results in actual proportional representation. And because of that unique factor, a rare factor, that's something that's important both on the probability of success on the merits and on the balance of equities. And I propose to begin by talking very briefly about the balance of equities and then spend the bulk of my time on the probability of success on the merits. But what happened in Pasadena? Pasadena has about 50% of its population, citizen voting age population, or CVAP, is Hispanic. 42% of the registered voters are Hispanic. And in the election system, which has an eight-member city council, four of the eight seats are 50%. I'm sorry to interrupt you, but do we use that 42% number for any purpose as we're reviewing this? Under the case law, do you use the actual number of registered voters, or do you only use the citizens of voting age population? I think the CVAP number, citizens of voting age, is the more important number. And so that's basically what we're going to use. It did, however, result in 50% of the seats are 100% of proportionality if you look at CVAP. If you look at registered voters, which is sort of what would tell you if you did a random analysis, 120% of representation. But it's 100% of representation of CVAP. That's the important number. And because of that, if a stay is granted and this system is required to be used in the 2017 election, it's not going to enter the plaintiff. This is a system that resulted in full proportionality. Well, two, she found that the 6-2 plan was enacted with discriminatory intent. So it's your position, on the balance of the harms, I think you assume for each side that they're going to end up prevailing and see which harm is greater. Won't you acknowledge that allowing a plan to go forward that Judge Rosenthal found and we may uphold was enacted with discriminatory intent is a significant harm? Well, Judge Rosenthal acknowledged, at least in the argument and when we were arguing it before her, that if there is no discriminatory effect, then you don't even get to the discriminatory intent question. We disagree strongly with the discriminatory intent finding, but we believe that it's very clear there is no discriminatory effect. But if there is, you concede, if that ends up getting upheld, you concede that's a significant harm, don't you? Well, I don't think if there is no discriminatory effect that there's any harm. But assume at all, assume her entire opinion gets upheld eight months from now or whenever that happens. And a stay means that we ended up having this election under this plan that ends up being affirmed to be having discriminatory effect and intent. That's a significant harm, isn't it? Well, certainly... Yes or no? It may be a harm to the plaintiffs if it in fact has a discriminatory effect. We don't think that it does. We think that the... Maybe. Isn't the whole premise of the Voting Rights Act that given our history and the importance of the right to vote that the courts have an important role to play, Congress decided in preventing elections that have discriminatory effect or intent? Sure. Certainly. And in fact, on the harms, the 8-0 system was in effect from 1992 to 2013, I believe. Is that right? That's correct. So by my count, you have elections every two years. There's at least 10, I think it's 11, elections under the 8-0 system. Something like that. And during those 11 elections, about half the time it resulted in having a Hispanic on the city council. So what was so harmful about the 8-0 elections that happened over 10 times? Because they don't reflect the will of the people or the will of the city council. And it is a reputable harm to the city if it cannot enforce its rules. And that's what this court said in Planned Parenthood of greater Texas. And in VC, it also said if you go through an election, you're holding an election different than the one the state adopted, you can't run that election again. And that is a reputable harm to the city. I have a question about VC, the injunction VC, the VCB Perry injunction. In my very learned colleague's opinion, it says the only constant principle that can be discerned from the Supreme Court's recent decisions in this area is that it's concern about confusion resulting from court changes to election laws close in time to the election should carry the day. And the Supreme Court has entered two stays, staying stays previously granted in recent times, which the idea that the older system should prevail. Do you argue in this case that your 2015 plan should remain in place because it would disrupt the status quo? Or are you only responding to opposing counsel's argument that the status quo is the 2013 plan? Are you arguing yourself that it's that it would be disruptive to implement Judge Rosenthal's order? Disruption is not the main issue that we are presenting. It is, obviously, it is disruptive of the status quo because the status quo was the 2015 plan. We think that there is sufficient time to use the 6-2 plan, which is the one that has been in effect. It's not going to pose a problem to switch to that. Do you believe there's sufficient time to use the 8-0 plan? That's the question I'm asking you, is do you believe that there's sufficient time to use the 8-0 plan? Or do you argue that there's not sufficient time to use the 8-0 plan because of the impending sign-up date? I cannot represent to the court that we could not use the 8-0 plan. I'm not going to represent that. Okay, so you're not arguing that. People have filed under the 8-0 plan since Judge Rosenthal's juncture. People have filed, but there is ample time to change to the 6-2-1 and certainly an amount of time that is comparable to what the Supreme Court has said is appropriate in other cases. Also, everyone that filed, and you have a copy of this in my reply, was given a letter from the city secretary explaining the status of the stay, the fact there was a stay, what would happen if the stay was granted and the city would notify everybody and they should also look to the news media to make sure they were aware of what was going on. Is one of the reasons that you seek a stay because the district court implemented the 8-0 plan rather than giving you, the city, the time to fashion its own plan? When there needs to be a remedial plan, it's my understanding it needs to go back to the government entity first to let them try to fashion a plan that would meet if there's been a finding. Yes, Your Honor. We think the district court erred in that instance because she had the opportunity to accept a plan that resolved the issues she found. We disagreed with the issues she found, but we could resolve those with changes to the 6-2 plan and presented that to her and indicated that if we needed the city council to do that, we weren't able to do it in the very short period of time given the notice requirements. We had to put that together, but we could do that in a few days. Do you brief that argument? Pardon? Do you brief that argument? We did not brief that. We did not put that in our statement. Before you get into that, could you answer Judge Elrod's question of whether we can grant a stay on an argument not raised in your application for a stay? Well, I think we certainly did raise the argument. We didn't specifically, I think, brief the issue of her denial of that. Maybe we mentioned it. I'd have to go back and look. It's in a footnote. Yeah, we mentioned it in a footnote. Correct. I'm trying to remember the three or four applications for stays and replies that have been written. So it was raised. It is in a footnote, and so that is a possibility. On the merits position that you were getting into, as I understand it, your argument is that in looking at proportionality, which is one of many circumstances considered in the final jingles analysis, that Judge Rosenthal should have looked at the actual election results in 2015 under the 6-2 plan, in which four Latino-preferred candidates won. If you get your stay and the elections happen this year and only two Latino-preferred candidates win under the 6-2 plan, then under your analysis would there be a whole new determination, and that would constitute vote delusion or at least not proportionality, because only 25 percent of Latino-preferred candidates would have actually won? Well, the Voting Rights Act doesn't guarantee success. It guarantees opportunity, and clearly there is opportunity under that plan. I think that in this plan, if you look at it, the odds of only two Hispanic-preferred candidates winning are pretty remote. You have a district that in the district and in the predecessor district, the Hispanic-preferred candidate has won two times. The last time, with 57.5 percent of the vote in a three-person race, he's running again. Another one, the candidate is term-limited, but it is overwhelmingly Hispanic. There is a third district where no one has run but Hispanics. But isn't your approach the exact results-based approach that you just said the Supreme Court has said we don't look to? We don't look at the actual results. We look at the opportunity. Well, no. But you're saying the results are 4-4. I'm sorry, Your Honor. I didn't mean to interrupt. You're saying the results are there were four of eight in which the Latino-preferred candidate won, so those results show proportionality. I am saying that, and I don't think the Supreme Court said you don't look at results. I'm saying the Supreme Court says you look at opportunity. There's no guarantee of success. The fact that maybe two would have won does not disprove the fact that there is opportunity. And in proportionality, the district court has had the idea, based its opinion in part on the fact that proportionality is discussed in applies only if you have majority-minority districts. Isn't that what footnote 11 says? In the footnote, or in Johnson v. DeGrande, they had majority-minority systems before them. They had zero election results. There had never been an election under that plan. And in fact, that's almost always the case in these because normally the trial is done after the plan, certainly in legislative redistricting like DeGrande was, after the plan is adopted, but before there is a result. I had some questions about block voting and some things that are not in the record. Is there information about the mayor's race in 2013? What was the situation with regard to that in block voting? That is not in the record. Nobody studied that. The plaintiffs, neither the plaintiffs nor the defendant's experts studied the 2013 race for mayor. I also had a question about District B. That seemed an odd situation to me. It also seemed like if you look at the difference between the woman who won, the drop-off between Latino vote and the drop-off between Anglo vote was similar. I think it was a 14 or 15 percent drop-off between, was it A and B? It was 19 percent. I'm not sure it demonstrates block voting. We're talking about District B? Yes. That's where Mr. Lehman beat Mr. Perez. And there was a significant Anglo vote, 36 percent or something, for Mr. Perez. He didn't win, but it clearly is a Hispanic opportunity district because three out of every five— I'm just going to the block voting issue because it seemed like it might have been candidate. It might have related to the Latino candidate because there was a significant difference in the two different districts on how the Latino vote was. There was a significant drop-off both in Latino and non-Latino vote in that district. It didn't seem, it wasn't clear to me that it could all be attributed to racial issues as opposed to— And how do we factor in voter turnout into all of this? If voter turnout was really, really low, how do we factor that into the block voting analysis? And that's something that there is clearly, if voting turnout is low, there is opportunity to correct that. The opportunity is there. And in District B, three out of every five registered voters are Hispanic. That is one where Hispanics clearly have the opportunity to turn out and vote. And if they don't, under Salas v. Southwest Texas Junior College District, that court said—and that's the Fifth Circuit— you know, it's just a question of not taking advantage of the opportunity, and opportunity is what the Act provides for. Is it your position that District D, as in Dog, is an opportunity district under the record in this case? Absolutely. It's one that resulted in the election of a Hispanic in its predecessor district, which is very, very similar. Ninety percent of the old district's in the new one. Seventy percent of the new district is composed of the old district. The Hispanic was elected. The person does not have a Hispanic last name. His name is Wheeler, but he won. But you're not just relying on the outcome. You're talking about the 47 percent or something, that that's enough to make it an opportunity district. Is that your point? It certainly is, given the background of that district and how the vote— I have one more question. The district court relied upon issues in the Senate report, responsiveness to minority concerns, that are not enumerated factors that are the Senate factors or the Gingell's factors. Is it your position that that was error for the district court to rely on those other points that are not actual factors? Or is it your position that that's—you're not complaining about that? Well, I'm not complaining about the fact that she relied on them. I do think that the facts did not support her conclusions on it. And those are—you know, responsiveness is not something that is a major factor in determining proportionality or opportunity to elect. And if you actually look at the record, the anecdotal evidence that she did rely on is very much rebutted by the evidence of specific projects, specific dollar amounts that were spent that are never cited in the district court opinion. Thank you, counsel. Would you add four minutes to the— Thank you. Good morning. The city's claim of a substantial case on the merits or likelihood of success on appeal is that the outcome of two contests in 2015 is dispositive of the vote dilution analysis. This argument doesn't rise to the level of even a substantial case on the merits. And the balance of the harms tips sharply in favor of the plaintiff voters in this case. The district court considered the city's argument at summary judgment and at trial. And the district court did weigh the evidence of those two contests in 2015 along with the other contests in 2015. Why shouldn't we stay the district court for the reason that D may or may not be an opportunity district as it's constituted? And even if it's not, it could be tweaked slightly to definitely be one and that that's a more—a solution that's more respectful of the legislative intent rather than getting rid of those at-large districts? Because the district court found, and her fact findings are not clearly erroneous, that District D is not an opportunity district and that the one election outcome for Mr. Wheeler in 2015 was not enough to outweigh the other evidence. Right, but assuming argumento that it is not right now an opportunity district, why was the solution that she implemented, the 8-0, rather than just a tweaked 6-2, the correct solution that would be more respectful of the legislature's—the city's intent? Because the district court didn't have information that was sufficient to allow it to conclude that the city's suggestion of making small changes, keeping a 6-2 plan but changing the lines— But it didn't give it time. I mean, it had a week. There's not much time. And I think our case law says you're supposed to let the city have a chance or the legislative body have a chance. Yes, Your Honor, and the district court was threading the needle in terms of timing. Candidate filing would open on January 18. The district court decision was on January 6, and this was within three weeks of the end of briefing for the post-trial. So it was an extremely urgent schedule. After the district court made its ruling on January 6, it called for suggestions on what to do with the remedy. And then given what it had at that time, the most deferential thing that the district court could do in light of the violation that it found was to go to the city's enacted 2013 plan. Well, that wasn't the most deferential thing. It could have said, we're going to go ahead with 6-2, and we might enlarge this a little bit, or we're going to leave it be, and I'm going to take some time to fashion, but we're not going to disrupt this particular election. That was not the most deferential thing it could do. It was the most deferential thing the district court could do in light of the violation that it found. It did find that District D was not an opportunity district. The city did not disclose a block assignment file or any information about its 6-2 suggestion when it made that suggestion. So the parties were unable to analyze the tweak, for lack of a better word. The court was unable to analyze it, and the plaintiffs were unable to analyze it because the city only disclosed a map with some numbers, and without the block assignment files that we would need to run an analysis. The court would have had to displace the election schedule for the city to give consideration of the facts surrounding the tweaked plan. It wasn't enough time to do that. Did the city cite the remedy as a problem that warranted a stay in either the district court or in its application for a stay in this court? I do see in its reply brief for the stay in this court at footnote 1 there's mention of the remedy, but in either the district court or its actual application for a stay in this court, which is the only document you had a chance to respond to here, did the city cite any defect in the remedy procedure as a basis for the stay? No, Your Honor, and we didn't know that the city was going to try to come up with a tweaked plan until after the court had ruled and shortly before it imposed its remedy, which was to turn back to the 2013 redistricting plan. As I mentioned, there was insufficient time to analyze the tweak in terms of how it would actually play out for opportunity to elect. There would have been a way, for example, to re-aggregate past election results, see if the districts would perform. How long would that take? If we had had the block assignment files when the city proposed the tweak, we could have done it in a matter of days, Your Honor, but the city did not disclose the block assignment files for the actual plan, only a picture of a map and a table that gave us Spanish surname, voter registration, and citizen voting age population. Without that information, even under an expedited schedule, we wouldn't have been able to engage on this question whether the tweaked plan would have provided opportunity to elect. And it wasn't just the changes to D. There would have also had to have been an analysis of whether the shifting of Hispanic population into D to bolster it up somehow undermined any one of the other three districts. So it would have been a greater analysis than just the effect on District D for the temporary tweak. Could we have done it and moved the filing period by a week or two? I don't know, but because we didn't have the block assignment files from the city, it became a moot point. There wasn't enough information for the court to determine that the tweak actually provided the opportunity to elect that the city claimed that it did. Do you believe that this opinion hinges on the use of race and party as proxies for each other, or would the opinion stand without that? Oh, absolutely not, Your Honor. There was considerable evidence in the district court that race was a motivating factor for the change. There were a few stray references to partisanship, and the court looked at those and found that the city was using those terms as proxies for race. That's what I don't know, but you're not saying that's an important finding. It is not an important finding. Because someone saying Pasadena's going to turn blue, that doesn't sound like a proxy for race, even if someone thought it in their mind. There was only really two references to partisanship. One was in a meeting in which everybody was Anglo except for the Hispanic witness who testified. And then there was another reference to partisanship, which was that the city employee who had instructed the vendor for a mailing to pull out Hispanic names from the mailing list testified later that he didn't mean to say pull out Hispanic names. He meant to say pull out Democratic names. And when the court asked him, why didn't you just say pull out Democratic names, the witness said, I don't really know why I said that. But that appears to be really the only real evidence of that point, that Mr. Scott did that one time, and not that the mayor acquiesced or any kind of thing like that. And there's no other evidence of partisanship at all in this case, Your Honor. These are nonpartisan elections. Universally the witnesses testified that partisanship has nothing to do with the operations of the city, and the city is not claiming a partisan justification for the change. So this is just a stray thing that we don't even need in this very scholarly opinion? No, because the court addresses these two stray mentions of partisanship merely to say that when those stray references happened that the court felt that it was more of a reference to race than partisanship in any event. But partisanship is not a factor in this case because the city hasn't raised it as a justification. Likewise, the gun references, the court says it's some evidence, albeit weak evidence. You don't rest on that, do you? You don't believe that gun situation is important in this case, do you? The gun evidence went into the totality of circumstances. How is that even relevant to whether or not it's a racial thing? The fact that someone has a gun, unless they're wielding it or threatening someone with it, and there's no evidence of that, I don't understand why that's even pertinent whatsoever. The district court found that it was not a heavily weighed fact. It was not an important fact, but the testimony at trial in the district court was closer to the facts and the record and the credibility determinations. But what is it? How is it relevant? Credible or not, how is it relevant? It was relevant because the meeting to which the mayor brought his gun was a very hotly contested meeting in which the city would take public testimony regarding the new redistricting plan under the 6-2 system. It was extremely controversial, tensions were high, and many of the people who came to speak in opposition to the redistricting plan were Hispanic. And the mayor, against the law, brought a firearm to the meeting and testified that he was going to brand a ship if things became threatening to him. And the court took that as a small fact. Certainly the decision doesn't turn on that, but that is what the record showed and the court took that in. Well, Arlington Heights says you can, in determining intent, one of various factors is whether procedures were violated that would show this was a particularly volatile issue and perhaps one motivated by race. But I want to move to the vote dilution analysis. And the city, first I argue we should look at the result that four Latino preferred candidates out of eight won. But they have a somewhat connected but somewhat distinct argument that even aside from looking at the election results, a few of these districts, including the two at-large districts, they're not majority minority under the facts found by the district court, but they're close to it, and therefore they should count as crossover districts, and crossover districts should be used in the proportionality analysis. It's a little bit interesting because Section 2 plaintiffs that you often represent are usually the ones pushing for courts to consider crossover districts at the first step of the Section 2 analysis, and the Supreme Court in Bartlett said, sorry, we're not going to allow that in Justice Kennedy's opinion. But when looking at proportionality, at the end of the day, you're trying to figure out does this minority group have voting power that's not being diluted, that's reflective of their actual presence in the community. Why shouldn't we look at the fact that, as the city points out here, you can actually, five of the districts, there's a decent chance Latino-preferred candidates can win a majority in these districts. Well, that is certainly not apparent from the record, Your Honor, or the district court's findings. The district court was analyzing each district for whether it would provide opportunity to elect, and it's the city's contention that two contests, one at-large establishes that at-large elections are equal opportunity to elect for Latino voters, and then one other contest in 2015 in District D establishes equal opportunity to elect. This is a proportionality argument under Johnson v. DeGrande, and the two legal errors here are, first, that a single election can dispose of the question whether a district is an opportunity district. That is a claim of legal error by the city that the district court aired, and there is not a single case to support the contention that one election in a minority Latino district where all of the candidates had Anglo surnames disposes of the question of opportunity to elect. The second legal error by the city is that when there is proportionality, that's dispositive of the Section 2 inquiry, and there is not one case to support that contention, and in fact the cases go the other way, beginning with the seminal proportionality case, Johnson v. DeGrande. I'd like to point the court's attention to the very first effects case under Section 2, which is Thornburg v. Jangles in 1986. That's where the Supreme Court really set down the rule for the analysis under the totality of circumstances. The Supreme Court in that case affirmed the district court, Jangles v. Edmundson, where there had been a recent election where African-American preferred candidates had prevailed in almost all of the challenged districts, and the district court looked carefully at that one election and the election results and the election of African-American preferred candidates weighted in the totality of the circumstances and concluded that those results did not answer the question of vote dilution. That's what the district court did here, following very loyally to the instructions that are given to us in Thornburg v. Jangles, Johnson v. DeGrande, and Lulac v. Perry. It is not the district court who made an error of law here that would create either likelihood of success or a substantial case on the merits. The two arguments of error that are being put forward by the city have not a single case to support them, and thus at the state stage there is no reason to grant the state because of the likelihood of success. Now maybe the city wants to forge on in the appeal and try to make new law, and it's certainly their right to be able to do that, but here and now there is no likelihood of success on appeal because there is no single case supporting these contentions. Can you walk us through what the evidence is that it has the effect of vote dilution and then also walk us through what the evidence is that it has the intent of vote dilution? And in doing so, can you exclude anything that are statements by other city council members as to what the motives were? Some of these statements are exactly the same. The exact statements that were called into question, one of the legislators was quoting these statements in V.C. that we said should not have been considered. So they shouldn't be considered here either. Yes, Your Honor, and it is our contention that the district court did not rely on opponents' statements as evidence of state of mind. As city council members, as evidence of state of mind. Well, they said he meant to do such and such. His intent inferred would be an improper. So tell us what the evidence is, please. So first, as to the city's contention that at-large elections provide an equal opportunity to elect, the district court looked first, as it's required to do under Johnson v. DeGrande, as to whether at-large the city is majority Hispanic because the rule under Johnson v. DeGrande is to look at majority-minority districts. Then the court went for it because the city is not majority Hispanic in citizen voting age population or registration,  But the court then performed a functional analysis. And looking at the 2015 election... Should that be a benefit? Does that benefit you that the drop-down in our analysis goes to 42%? Or is that really harmful to you because if the people actually registered and voted, then some of these other ones could turn out differently? Well, the case law is uniform, Your Honor, that lower Hispanic registration and turnout rates, lower minority registration and turnout rates are often tied to a history of past discrimination and the current facts, as well as what the court found here, which was continuing discrimination against Hispanics in the city. And the court connected that to a lower level of political engagement by Hispanics in the city of Pasadena and a sense that... I don't want to put this the wrong way, Your Honor, but a sense that not being able to be effective in city elections or being able to elect candidates who were more responsive to their needs tended to have more of a depressive effect on voter registration turnout than it had an enhancing effect. And so we would contend that 42% voter registration from a citizen voting age population in the upper 40s would be pretty typical, and then a voter turnout below that would also be fairly typical in these types of cases. I would like to turn to the court's functional analysis of at-large elections, and the court did look at what happened in 2015. With respect to the 2015 at-large election, which is looking functionally at how the city voted, there was one Hispanic who ran at-large in 2015, Mr. Del Toro. He was soundly defeated as a result of Anglo block voting, despite the fact that he had close to 90% Hispanic cohesive voting support. Mr. Del Toro lost his race citywide. At the same time, Ms. Van Hout won narrowly by 143 votes. She was in a race involving two Anglo candidates. She herself is Anglo. Her opponent was Anglo. And as a result, she was able just barely to pass that 50% mark. She was also already on the city council, and the court observed properly under the case law that incumbency can add a little extra push to a candidacy. And so the court weighed Mr. Del Toro's sound defeat against Ms. Van Hout's narrow victory in a case involving a situation involving only all Anglo candidates, and concluded in the totality of circumstances, considering demographics, racially polarized voting, the Senate factors, and the 2015 election results, that the city at-large did not provide an equal opportunity to elect for Hispanics. Same thing with District D. She looked at the election of Mr. Cody Ray Wheeler, who is Hispanic, but does not promote that aspect of his identity when he's campaigning among Anglo voters, and that's in the record. He won in District D. He was already on the council, so he had the assistance of incumbency. Mr. Del Toro, when you look at his results within District D, loses. So the court, again, is able to see that District D elected Mr. Wheeler in the one time that that district was used for election, but was unable to elect Mr. Del Toro, who was also highly favored by Hispanic voters, demographics, totality of the circumstances, and concluded that District D did not offer an equal opportunity to elect. So that was the functional analysis. But one point I'd like to make, Your Honor, about the proportionality inquiry is that the district court went further and said, even if there is proportionality in this plan, it is outweighed by the other factors in the totality of circumstances. So the district court did do the analysis under the whole totality, whether even if there was proportionality, it would override the other factors, and the district court concluded that it did not. On going to the stay factors, what's your take on whether what's been called the Purcell principle, this idea that courts shouldn't make changes near in time to elections or once election procedures are underway, how does that play out in this case? Here, because the election is underway, because we have between, let's see, 17. The filing period is underway. Yes, the campaigning is underway. The court has attached several declarations from candidates who have spoken to hundreds of voters, and the reason that they're out there campaigning at this point, despite the city's characterization of this as manufactured, is because low-propensity voters in a low-profile election with the kind of retail politics that occur in Pasadena, candidates have to get out there early. They have to make multiple contacts, particularly with respect to the Latino community. Latino voters may know to vote in a November election, but if they are low-propensity voters, they're going to have to need additional contact and voter education regarding a spring election for city office. What authority do you have that we can consider those affidavits on appeal that were not presented to the district court? We were unable to present them to the district court, Your Honor, because the notice of appeal had been filed. But what authority do you have that would be appropriate for us to consider this additional evidence at this time? I do not have a case, Your Honor, but I would say that in most cases involving consideration of stay, there is typically extra record information that is considered. For example, if other mail ballots have gone out, what types of injury would be occurred by the jurisdiction if it stays. But this actually contains the affidavit's viewpoints on what the effects would be. It's sort of their own speculation, and it hasn't been tested. It seems like it's not very probative of the issue, even if they are considered. Well, it is the information that is available to the court right now that campaigning has begun, that candidates have spoken to hundreds of voters at this point. What evidence is there in the record that if we granted the stay, there would be an orderly time to allow? I guess the candidates would have to reapply under the 6-2 format, and what evidence is there that that would be a smooth, orderly process for which there would be enough time? There is not evidence that it would be a smooth and orderly process, and, in fact, it would create confusion and lower voter turnout. It also creates a disparity in the treatment of voters, Your Honor. And the movement has the burden on a stay, so to the extent there's no evidence on what would happen to the election process that's already underway, doesn't that hurt the movement? It does, and the city has not argued, and you heard this today, the city has not argued that it would have to retrain poll workers, change its procedures as a result of the implementation of its 2013 plan. It would not have to print any kind of different materials. The city will not experience an injury to its procedures or its use of money or staff time, but voters on the other side will experience an enormous impact and be treated differently. Some voters will stay in their district, and they will continue to be deciding to vote between the candidates that they understand that they have in front of them now. A whole other set of many thousands of voters will be shifted into another district, and they will have to then gain a new set of candidates and relearn what the positions are. So the disruption is quite uneven to voters depending on where they live and how close they are to the current district boundaries in the 8-0 plan, which is where they currently think they are going to be voting in May. Counsel, one significant part of the district court's opinion is the monitoring that's set up in the opinion, but is that relevant at all to this analysis that we're conducting today? No, Your Honor, I don't believe so. I think the stay is specifically aimed at whether or not to use the 2013 redistricting plan or the invalidated 2015 redistricting plan. So whether or not that was an appropriate legal decision doesn't bear on whether we should grant a stay or not? With respect to Section 3 bail-in, Your Honor, no. I believe that the issues are quite separate. The last thing I wanted to mention before I leave is that because proportionality is only one of nine factors in the totality of the circumstances analysis, the city's claim of error here is limited to proportionality, and thus it does not raise a substantial claim on the merits because even if the city is right on proportionality, it still has to be weighed within the totality of circumstances, and there's no question that the district court did that weighing, and the city raises no argument with the district court's findings under the other aspects of the totality, the other nine Senate factors, and then tenuousness and responsiveness, which is mentioned in Lulife v. Perry, and then finally proportionality. Thank you. Thank you. In respect to the question of proportionality, which has been discussed extensively, first, that's not our only argument in this case, although I think it is our initial one because it is such a compelling and important fact that as we say, and I don't want to get into all this, it's in the brief, but the district court I think used a maximization standard and used improper standards or ideas about the Section 5 and tried to integrate some of the Section 5 standards with the Section 2. On your proportionality argument, you ended your last bit of time by saying, acknowledging most of the cases do look just at majority-minority districts based on demographics because most of these cases are pre-election. There's never been an election under the plan. And so it seems to me you're acknowledging no case says what you want, and maybe it's because no case has been out there, but doesn't the fact that you're asking us to apply a new rule for what may well be a novel situation, which may end up carrying the day on appeal, but doesn't that by definition make it hard for you to show a substantial likelihood of winning that argument when no case law has ever adopted your position? I disagree, Your Honor, and part of the reason for that is, and I will agree there is no case or appears to be no case because there are not a whole lot of proportionality cases out there. The ones that do are in this short time frame. But if you look at Johnson v. DeGrande and you read the entire case, and of course all they were talking about is a situation that was before them, which is a situation where all they could look at was majority-minority districts because that's what there were and there hadn't been an election. But they go on to say and talk about the fact, for example, that they don't want to make proportionality a safe harbor for various reasons, one of which is you might have all sorts of things where people are denied access to the polls, they're not able to register, et cetera, all sorts of things that are not present here. But also they said if we encourage people to draw majority-minority or to make this the be-all and end-all, then people are going to go out and draw majority-minority districts to comply with Section 2, and that's contrary to the purpose of Section 2 and of the Voting Rights Act. And they spend at least a paragraph or so about that saying that the Act is designed so as not to require majority-minority districts and that you want to have a situation where you have coalitions and the minority groups are not immune from the obligation to pull, haul, and trade to put together an effective majority, electoral majority. And so de Grande itself talked about that something other than a majority-minority district ought to work. Now, they didn't say it specifically in let's measure proportionality by this, but certainly that's what they meant and what they were saying as the ultimate purpose of the Act. But footnote 11 in that opinion does exactly what Judge Rosenthal did of looking at majority-minority districts under demographic standards. So it seems to me, even if you're right, that maybe there's this other way to assess proportionality. Given that the Supreme Court has sanctioned the approach Judge Rosenthal used, how can that be legal error? Because if you read the entire Supreme Court opinion, they are looking at and saying that a majority-minority district is not necessary to comply with Section 2 and to provide electoral opportunity. And what Justice Breyer says in that is looking at these districts that on their face provide equal electoral opportunity, we don't see how there's any case. And if you have cases or districts that show that and show it through majority-minority percentages, but also that show it through actual electoral results or a history of crossover voting, that works as well. And I think DeGrande read in its entirety is entirely consistent with that. And you can go to other cases. Bartlett, when it gets down to talking to the third prong of Jingles Factor, and they talk about coalition districts are ways to comply with Section 2. And if you look at Alabama Black Legislative Caucus, they say don't look just at percentages. Look at actual ability to elect. I'm happy to answer questions when my time is up. We have your argument. Thank you. Thank you. The case is under submission.